McKinney, J,
delivered the opinion of the court.
The plaintiff in error, was indicted in the circuit court of Giles county, for the murder of Mary Jane Wilsford; and was found guilty, by the jury, of murder in the first degree, as charged in the indictment. The jury also found that there were mitigating circumstances in the case. The prisoner moved the court for a new trial; but the motion was overruled,-. and judgment pro *104 nounced, that he undergo confinement in the jail and penitentiary house of this State, for and during the period of his natural life. A bill of exceptions, setting forth the proof in the case, was signed and sealed and an appeal in error prosecuted to this court.
Upon a careful consideration of the proof, we feel constrained to say, that the facts of the case, as presented in the record before us, furnish no sufficient ground, in our judgment, for disturbing the verdict of the jury. It therefore only remains to inquire, whether or not the legal principles applicable to the facts of the case, were correctly stated to the jury, in the charge of the court.
The deceased was the wife of the prosecutor, and her death was caused by a pistol shot, discharged by the prisoner. It seems to have been a question, earnestly discussed on the trial in the circuit court, as well as in the argument here, whether the shot, which resulted in the death of Mrs. Wilsford, was intended by the prisoner, to take effect upon her or the prosecutor. In reference to this question, the judge instructed the jury that, “ if the defendant intended to kill the husband of the deceased, and undesignedly killed the deceased, the offence would be the same as if he had killed the husband; that is, if the defendant had killed the husband of the deceased, and such killing would have been excusable homicide in self-defence, as already explained to you, then you should acquit the defendant; "and so, if he had killed the husband of the deceased under such circumstances, as would make the offence manslaughter or murder in the first or second degree, as already explained to you; then, though he undesignedly killed the deceased, it would be the se offence as if he had killed the *105 husband of the deceased, and you should fix the punishment of the defendant accordingly.”
The only question presented upon the record is, whether the principle announced in the foregoing instruction, is applicable to the crime of murder in the first degree, as defined in the third section of the penal code of 1829. That this principle is correct in reference to murder at the common law, is conceded, and that it is equally so, as respects murder in the second degree, and all the inferior grades of homicide, under the statute, is not to be questioned. But that it is wholly inapplicable and directly opposed to both the-' letter and spirit of the statute as regards murder in the first, we think is clear beyond all doubt.
In order to a correct determination of this question, we are to inquire, what was the intention of the legislature? What change of the existing law, upon this subject, was contemplated by the statute ? What particular evil was designed to be obviated or at least alleviated? The common law, which was in force here, prior to the statute of 1829, recognized no distinction in respect to felonious homicide, except that between murder and manslaughter; the distinctive difference between which two offences is, that malice aforethought either express or implied, which is of the essence of murder, is presumed to be wanting in manslaughter; the act, in the latter offence, being rather imputed to the infirmity of human nature. In regard to the latter crime, a distinction, certainly reasonable and just in itself, was also taken between voluntary and involuntary manslaughter. But in relation to the higher crime of murder, the common law made no discrimination: all murders, irrespective of their greater or less malignity and atrocity, were, so *106 far at least as respects the punishment, on the same footing. And, without regard to the intrinsic nature of the case, or circumstances tending to enhance or extenuate its legal, as well as moral guilt, the uniform and indiscriminate punishment was death.
"With a discrimination more conformable to the dictates of reason, justice and humanity, as well as to the spirit of the age, the penal code of 1829, had in view, among other objects, the admeasurement and adaptation of punishment to the different degrees of crime, according to their different degrees' of malignity, as far as comported with the public safety and policy. Tn the accomplishment of this purpose, the crime of murder (the definition of which, contained in the second section of the statute, is borrowed in exact terms from the common law,) is divided into two grades, with a view solely to the graduation of the punishment* The third section enacts that, “all murder which shall be perpetrated by means of poison, lying in wait or any other kind of wilful, deliberate, malicious and premeditated killing; or which shall be committed in the perpetration of, or attempt to perpetrate any arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree; and all other kinds of murder shall bp deemed murder in the second degree.” In this general definition, and enumeration of specific instances constituting murder in the ‘ first degree, there is a classification of various kinds of homicide, which it may be of some importance to notice, with a view to the • question under consideration.
In eases of murder by means of poison, or lying in wait, the most atrocious and detestable of all kinds of homicide, and the least to be guarded against, either by resistance or forethought, the crime is made to *107 •depend exclusively upon the “means” causing death. So, likewise, in respect to cases of murder committed in the perpetration of, or attempt to perpetrate arson, rape, -robbery, burglary or larceny; a class of felonies most dangerous in their consequences to public safety and happiness, which may be most frequently and easily committed, and to which there are the strongest temptations. In all these cases, the mode or “means” of destroying life, supplies a conclusive legal presumption of malice and guilty intention; the crime, as well as the legal guilt of the agent, is made to depend alone upon the fact of taking life in either of the specified modes. In such cases, the question of malice or intention, as a matter of fact, is wholly irrelevant: it need not be proved, and cannot be controverted by the accused. But the remaining species of murder defined in the statute, namely, murder “by any other kind of wilful, deliberate, malicious and premeditated killing,” falls within the operation of a directly contrary principle. Here, the character of the crime and guilt of the agent, are made to depend exclusively upon the mental status, at the time of the act, and with reference to the act which produces death.
This accumulated definition of murder in the first degree, takes in all the ingredients of crime descriptive of the utmost malignity and wickedness of heart, as well as of the highest and most aggravated species of homicide. If the universal principle of construction is to be regarded, that every word in a statute is to have meaning and efieet given to it, if practicable, it results of necessity, by force of the terms employed in the definition of the crime, that to constitute murder in the first degree, it must be established, that there existed in the *108 mind of the agent, at the time of the act, a specified intention to take the life of the particular person slain. The characteristic quality of this crime and that which distinguishes it from murder in the second degree, is the existence of a settled purpose and fixed design on the part of the assailant, that the act of assault should result in the death of the party assailed ; that death, being the end aimed at, the object sought for and wished. 4 Hump. 136, 139. The “killing” must be wilful: “that is, of purpose,, with intent that the act, by which the life of a party is taken, should have that effect.” 10 Yerg. 551. “Proof must be adduced to satisfy the mind, that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought.” 1 Leigh’s Rep. 611.
If then, by misadventure or other cause, a blow, directed at a particular person and designed to take his-life, take effect upon and cause the death of a third person, against whom no injury was meditated, can it be said, that the will concurred with the act, which resulted in the accidental death of such third person ; or that there existed a specific intention to take his life. A grosser absurdity cannot be conceived. The hypothesis that the killing was undesigned, concedes-that the will did not concur with the act; that, in point of fact, no such specific intention existed'; no such result was either contemplated or designed. And upon what principle is it, that this would be murder at common law? Simply upon the principle of implied or imputed malice and intention. In such case, all the essential elements of murder at the common law concur. A homicide has been committed with deadly weapon, in the attempt to perpetrate a felony, by taking the *109 life of another person, without legal justification or excuse; and in such case, from the circumstances and deadly weapon, the law conclusively presumes malice and the intent to murder: and, in like manner, the law conclusively presumes that the party contemplated the probable consequences of his own act.
There is another principle applicable in such case, namely, the law by imputation, so to speak, refers the act of murder to the felonious intent existing in the mind of the agent towards the particular object of his revenge. “Thus,” says Blackstone, (4 Bl. Com. 201,) “if one shoots at A and misses him, but kills B, this is murder: because of the previous felonious intent, which the law transfers from one to the other.”
But we have seen that murder in the first degree, as constituted by our statute, depends upon the existence of a specific intention to take the life of the particular person slain; and that the existence of such intention, as a matter of fact, must be satisfactorily established. Hence it is clear to a demonstration, that all legal implication or imputation of such intention, is excluded in reference to this particular species of murder. It is equally clear that all cases of homicide, not falling within the principles here announced, properly belong to that comprehensive class, included in the statute, of “all other kinds of murder,” and which are declared to “be deemed murder in the second degree.” To murder of this class, as well as to all inferior grades of homicide, the common law principle, asserted in the charge of the circuit judge, is still clearly applicable.
We are aware, that in Pennsylvania, upon a statute almost identical in its terms with our own, a different construction has prevailed. In the case of the Common *110 wealth vs. Dougherty, it appears from the note of the case, to which only we have had access, that the prisoner aimed a blow with an axe at his wife, and it fell upon the head of a child which lay on her shoulder, and inflicted a mortal wound, of which it died. And it was held by the court, that if the prisoner’s “ intent was to kill his wife, and killing her would have been murder in the first degree, killing his child will also be murder in the same degree.” With deference to an authority so respectable, we think it very clear, that no such conclusion can be legitimately deduced from the premises. We regret .that we have not seen the opinion at length, in the case above mentioned. The brief extract before us, merely asserts the proposition we have quoted; the process of reasoning by which the conclusion is supposed to be maintained, is not given in the note. We confess ourselves at a loss to understand in what sense it can be predicated of the act of the prisoner in “ killing his child,” that it was “ wilful, deliberate and premeditated;” and more especially how it can be made out, that the will concurred with the act, in such case.
The contrary construction, we think, is alone compatible with the plain terms of the statute, whether we regard their proper or popular acceptation; with the obvious spirit of the statute, which was to alleviate the punishment of murder, except in cases of the greatest enormity; with the benignant principle of interpretation, that, in favor of life, a statute is to be construed most favorably in behalf of the accused, and most strictly against him; and, finally, with that intrinsic and fundamental distinction, in respect to the relative guilt of human actions, dependant upon the concurrence or non- *111 concurrence of the will, which we trace as far back as the “ Jewish dispensation,” under which cities of refuge were provided, to the end, “that every one that killeth any person unawares may flee thither,” and be secure from the avenger of blood. Num. ch. 35.
The result is, that for the foregoing error in the charge of the court, and alone upon that ground, the judgment must be reversed.